*In re* MARRIAGE OF LISA J. EATON, Petitioner-Appellant, and TIMOTHY C. EATON, Respondent-Appellee.

Fourth District   No. 4—93—0764

Argued March 22, 1994.—Opinion filed February 10, 1995.

Diana N. Cherry (argued), of Metnick, Barewin, Wise & Cherry, of Springfield, for appellant.

Richard P. O'Connell (argued), of Richard P. O'Connell, Ltd., of Quincy, for appellee.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

Petitioner Lisa Eaton appeals from a denial by the circuit court of Adams County of her request to remove her three minor children

from Illinois. Petitioner and respondent Timothy Eaton were granted a judgment of dissolution of marriage September 11, 1990. The parties were married in 1977 and during the course of the marriage had three children, ages 7, 10, and 12 at the time of the hearing on the petition for removal.

Pursuant to section 609 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609 (West 1992)) petitioner sought leave to remove the children to live in Bonita Springs, Florida. Section 609 of the Act provides approval may be granted by the court if it is in the best interests of the child or children. The party seeking removal has the burden of proving removal is in the best interests of the children.

Following a hearing and an *in camera* interview with the three children, the trial judge denied Lisa's request for removal. The trial court found the proposed removal of the children to Florida would not enhance the general quality of life for the children. The court also found removal of the children to the State of Florida would substantially impair Timothy's involvement with the children, and the visitation schedule proposed by Lisa would not preserve and foster the relationships among the children and Timothy. We find the denial of the petition to remove was against the manifest weight of the evidence and reverse.

The parties were granted a dissolution of marriage on September 11, 1990, which awarded custody of the parties' children to Lisa. Timothy was granted visitation rights consisting of alternate weekends, Wednesday overnights during the summer, and Wednesday evenings during the school year, one-half of holidays, and two weeks' extended visitation during the summer. During their marriage the parties had resided in Chicago, Burlington, Iowa, and Palm Springs, California; they then moved to Florida, where they resided from November 1982 until their separation in December 1989. The two younger children were born in Florida. Timothy was employed as a golf professional during this time, and the moves were dictated by his employment.

Lisa and the children moved to Quincy, Illinois, from Florida in December 1989. Timothy traveled to Illinois at that time, but returned to Florida to continue his employment in late December or early January 1990. He then moved to Quincy permanently in April 1990. During the time when he was in Florida and the children were living in Quincy, Timothy had phone contact with the children, he came to Quincy to visit them in January 1990, and they traveled to Florida to visit him in March 1990. Timothy remarried in January 1993. He now works as a real estate salesman and building manager. Both Timothy and Lisa grew up in Quincy.

Lisa has a degree in special education and has been employed since the fall of 1990 as a teacher at the Adams County Youth Home, where her take-home pay is approximately $1,140 per month. She receives $550 per month in child support. As a single parent she has been financially pressed. Her earnings and the child support are insufficient to meet the costs of supporting herself and the children. This has forced her to borrow money from her parents. She further testified her life was more difficult socially as a single parent, and being single created problems in terms of child-care arrangements when it was necessary to run errands or perform some other responsibility on short notice. Lisa relied on her parents for child sitting when she was ill or worked late, but did not feel comfortable requesting their assistance for very brief periods.

Lisa sought permission to remove the children to Florida because she was planning to marry John Spear, an attorney originally from Quincy, who had been practicing law in Florida for several years. Spear testified it would not be feasible, from either a professional or financial perspective, to attempt to move his practice to Illinois. Timothy opposed the petition for removal on the grounds the removal would interfere with his visitation and relationships with the children.

Lisa testified, as a result of her pending marriage, she would be better off financially, she would have someone to share the daily chores of parenting with, and she would be in a better position socially and within the community. Spear testified to his 11-year residence in Florida, to his established law practice and to his involvement in the local Chamber of Commerce and Rotary. Both of these groups sponsored family-oriented activities. Spear and Lisa both testified Spear's home in Florida was comparable in size to the home occupied by Lisa and the children in Quincy, but was more modern. There was also testimony a larger home would be purchased or built following the children's move to Florida.

The schools the children would attend in Florida if the move were allowed had physical, academic, and recreational facilities equivalent to those available in Quincy, and the Florida schools had received awards for excellence.

Spear testified to the cultural, educational, and recreational opportunities available in the area to which Lisa sought permission to move the children. Lisa would be moving to Bonita Springs, Florida, with a population of approximately 25,000 year-round residents. Bonita Springs is approximately a 45-minute drive from Marco Island, where the parties lived during their marriage. Naples, Florida, is four or five miles south of Bonita Springs and has a population of

80,000 to 100,000. Ft. Myers is approximately 10 miles north of Bonita Springs, and has a population of 100,000 to 150,000.

Timothy has exercised all of his scheduled visitation since the dissolution, with the exception of the extended summer visitation. Lisa testified Timothy had not taken the two weeks of summer visitation until 1993, after the filing of the petition to remove. Timothy testified he thought he had taken the two weeks' visitation in 1992, and specifically remembered taking the children to St. Louis and to the Ozarks. He was not certain as to what other time he had the children or as to what they did during the remainder of the visitation. He could not recall what he did with the two weeks' visitation in the summer of 1991.

Timothy testified Lisa had not violated the visitation order and had been very good at keeping him informed about the children's school grades. The parties have attended parent-teacher conferences together. Timothy attends athletic events, school activities, and music recitals the children are involved in. The children occasionally stop by Timothy's house for a few minutes while waiting to be picked up from school. The parties have on occasion agreed to additional visitation. Timothy has sometimes requested additional visitation which was denied by Lisa because it conflicted with her plans or notice was insufficient. The trial court found Lisa's explanation for sometimes denying requested extra visitation satisfactory.

The children were initially upset about the move from Florida in 1989, but adjusted and made new friends. The children are all doing well in school in Quincy. There was testimony the children were also initially upset by the news of each of the parties' remarriage, but had adjusted and accepted these changes. During the *in camera* interview, all three children expressed a desire to remain in Quincy rather than move to Florida. The children have lost touch with most of their former friends in Florida.

There was substantial testimony presented regarding the children's contacts with their extended family in Quincy and how these contacts would be affected by the proposed move to Florida. In Quincy the children ride their bikes to their maternal grandparents' house. Lisa's parents attend many of the activities in which the children are involved. Timothy returns the children to the maternal grandparents' house after Wednesday visitation. Lisa's mother is teaching piano to two of the children. The children live close to Lisa's brother and his family, and frequently visit each others' homes. Timothy's brother coaches the children in various sports, and the parties' children have contact with Timothy's brother's children most times when they are at Timothy's house. Timothy's parents also engage in numerous activities with the children.

If the move to Florida were allowed, these contacts would not be entirely eliminated. There was testimony Timothy's parents own a condominium in Florida which they plan to visit for several weeks each year. Timothy's brother testified he and his family visit Florida approximately every other year, and visited every year when the parties resided in Florida. Lisa and Spear also testified they would return to Quincy for holidays and to visit their respective families. The children would be able to visit with their extended family during all of these times.

The trial court found, however, removal of the children to Florida would drastically reduce the amount of contact the children have with their maternal and paternal grandparents, their paternal uncle and his children, and their maternal uncle and his children.

The court noted the children had lived the majority of their lives in Florida, and they had faced adverse moves before and adapted. The judge also noted the children were getting older and developing more bonds with their friends and extended family.

The trial court found overall there were probably more opportunities for recreational and cultural activities and more events the children could attend in Florida than in Quincy. The judge stated, however, this did not convince him the move would improve the quality of life of the children. (Cf. In re Marriage of Ballegeer (1992), 236 Ill. App. 3d 941, 945, 602 N.E.2d 852, 855.) The trial judge found the school systems available in Florida and Quincy were essentially equal to one another.

The trial court found that moving to Florida would improve Lisa's quality of life, social, and financial situations, but the judge stated he was not convinced the move would improve the quality of life of the three children. The trial court found both Timothy's motive in opposing removal and Lisa's motives for seeking it were proper. Based on this evidence, the trial court denied the petition for removal.

A trial court's determination of what is in best interests of children should not be reversed unless it is clearly against the manifest weight of the evidence and it appears manifest injustice has occurred. In re Marriage of Eckert (1988), 119 Ill. 2d 316, 328, 518 N.E.2d 1041, 1046.

A custodial parent seeking judicial approval to remove children from Illinois has the burden of proving the move, considering its possible impact on visitation and other relevant factors, is in the best interests of the children. (Eckert, 119 Ill. 2d at 330, 518 N.E.2d at 1047.) Eckert states a determination of the best interests of a child or children must be made on a case-by-case basis, depending upon the particular circumstances of each case. Several factors which courts

are to use in deciding whether to grant or deny petitions for removal of children from the State of Illinois were set out by the court. (*Eckert*, 119 Ill. 2d at 326-27, 518 N.E.2d at 1045-46.) These are (1) whether the proposed move will enhance the quality of life for both the custodial parent and the children, (2) whether the proposed move is a ruse designed to frustrate or defeat the noncustodial parent's visitation, (3) the motives of the noncustodial parent in resisting removal, (4) the visitation rights of the noncustodial parent, and (5) whether a reasonable visitation schedule can be achieved if the move is allowed. A reasonable visitation schedule was described as one which would preserve and foster the children's relationship with the noncustodial parent. *Eckert*, 119 Ill. 2d at 327, 518 N.E.2d at 1046.

In denying Lisa's request to remove the children the trial court focused on two factors which indicated the move would not be in the best interests of the children. First, the court found the proposed move would *not* enhance the general quality of life for the children. The trial court noted in this regard the frequent contact the children currently enjoy with their extended family in Quincy and how that contact would be affected by the proposed move to Florida.

Second, the court found removal to Florida would impair Timothy's involvement with the children, and Lisa's proposed visitation schedule would not preserve and foster the children's relationship with Timothy. The court noted the schedule would provide Timothy with approximately the same amount of time with the children, but that time would be in long continuous blocks, rather than the frequent, year-round contacts now available. The trial judge found there was a qualitative difference between these types of visitation schedules. This is consistent with *In re Marriage of Creedon* (1993), 245 Ill. App. 3d 531, 537, 615 N.E.2d 19, 23-24. When removal to a distant location will substantially impair the noncustodial parent's involvement with the children, the trial court should examine the harm which may result to the children. *Eckert*, 119 Ill. 2d at 328, 518 N.E.2d at 1046.

Removal cases are difficult for courts to decide, and this case is made more so by the good faith of both parties in regard to the petition for removal. The trial court commended the parties for their cooperation in visitation matters and for attempting to resolve the removal petition. The trial court ruled the motives of Lisa in seeking and Timothy in opposing removal did not play a role in this case since both were proper. This is consistent with our holding in *In re Marriage of Branham* (1993), 248 Ill. App. 3d 898, 904, 617 N.E.2d 1317, 1321.

■ Lisa argues the trial court did not properly *balance* the factors

listed in *Eckert*, but treated them as prongs of a test, all of which had to be met in order for the court to allow removal. Some of the language used by the trial court in announcing its decision could give this impression. The court stated "[y]our client has got to satisfy me that the move would improve the quality of life of the three children." Reading the court's remarks as a whole, however, it is not clear whether the court required Lisa to meet all of the factors listed in *Eckert*, or was merely emphasizing those factors which were determinative in this particular case. *Eckert* does not suggest any one factor is controlling. The relevant factors should be balanced.

Lisa followed her former husband to Chicago, Iowa, California, and Florida during their marriage. They resided in Florida for seven years while Timothy worked as a golf professional. During that period the children did not have the opportunity to interact on a regular basis with the grandparents, aunts, uncles, and cousins who resided in Quincy.

Lisa has cooperated with Timothy in providing scheduled visitation as well as additional visitation. She has regularly communicated with Timothy regarding the children's grades. Under her primary care and guidance, the children are apparently happy, well adjusted, and have been encouraged to have contact with their extended family in Quincy.

In 14 years of marriage, Lisa was the primary caretaker of the children. She was awarded permanent custody in 1990 and dealt with all the day-to-day child-care issues a single parent faces from 1989, when she and Timothy separated, until the hearing on the removal petition in mid-1993. She has also faced the social, financial, and scheduling pressures of a single parent.

Now, she plans to marry a professional man who will provide her with love, economic security, a comfortable home, in a desirable locale, and a partner and helpmate in child rearing. Her husband-to-be resides in Florida—just a short distance from where she, her children, and former husband lived while in Florida.

No one questions her motive for seeking removal, but her former husband objects, and the trial judge was required to hear her removal petition, which he denied finding the move would not enhance the general quality of life for the children because they would no longer be able to enjoy contact with their extended family in Quincy and the removal would impair Timothy's involvement with the children.

This custodial parent has provided a good environment in a community with good schools, and has fostered the children's relationship with both the noncustodial parent and an extended family which enjoys regular contact with the children. This does not mean removal

is out of the question. (See *In re Marriage of Carlson* (1991), 216 Ill. App. 3d 1077, 1081, 576 N.E.2d 578, 580.) The trial court's ruling essentially allows a noncustodial parent who enjoys a good relationship with his children to veto the good-faith and reasonable desire of the custodial parent to remarry and move out of State without any consideration of what have been called the "indirect benefits" to the children. We do not believe *Eckert* or the Act should be read to provide such veto power to a noncustodial parent. While a custodial parent has the *duty* to foster the relationship between the children and the noncustodial parent (*In re Marriage of Dobey* (1994), 258 Ill. App. 3d 874, 877, 629 N.E.2d 812, 815), the duty does not require the custodial parent to give up the right to pursue a new life.

In many cases the motive of one parent or the other will be suspect, or the parent seeking removal will not have done any planning, or visitation will be extremely difficult because of cost or location. Those factors are not present here.

Lisa is now being penalized for having been a good and caring parent who encouraged her children to enjoy their extended family. It was *her* decision to return to Quincy in 1989 which gave those relatives the opportunity to know the children. The good relationships they have established need not disappear simply because of geography.

While the trial court applied the *Eckert* factors, it appears the trial court treated each factor as a separate test, rather than simply one of a number of relevant factors to be weighed and balanced. Further, the statement of the trial judge at the time of his decision did not mention or acknowledge any connection between the benefits of the move to Lisa and the quality of life for the children. There is a very real and meaningful connection.

■ A trial court *must* carefully consider the benefits which will flow to the children from the custodial parent's remarriage. (See *In re Marriage of Davis* (1992), 229 Ill. App. 3d 653, 660-62, 594 N.E.2d 734, 739-40; *Carlson*, 216 Ill. App. 3d at 1081-82, 576 N.E.2d at 580-81.) It is not accurate to describe such benefits as indirect. Lisa, on her salary plus child support, cannot meet expenses without borrowing from her parents. If she establishes a home in Florida with her new husband, her financial situation will improve significantly, and she will not even seek employment for the first year. That is a direct benefit to the children—economic security and comfort plus more time with their mother.

We do not suggest any improvement in the custodial parent's quality of life automatically inures to the children or such benefits will always be sufficient to merit removal. However, they must be

considered and there must be a recognition of the connection between the well-being of the custodial parent and the children. Our supreme court has recognized the connection. "The court should consider the proposed move in terms of likelihood for enhancing the general quality of life for both the custodial parent and the children." (*Eckert*, 119 Ill. 2d at 326-27, 518 N.E.2d at 1045.) The failure to fully consider the connection in this case was error.

Both parents while married apparently believed the oldest child could cope with change and new environments because they lived in several locations before settling in Florida where the two youngest children were born. The children also adjusted to their move from Florida to Quincy. It is likely they will adjust to a return to Florida, particularly when they will be able to attend good schools in an area of the country which has excellent recreational and cultural opportunities and their mother will see a meaningful improvement in her financial and social situation.

Any removal will have some effect on visitation, but the real question is whether a visitation schedule that is both reasonable and realistic can be created. It need not be perfect. Lisa is the same mother who cooperated in visitation and fostered the children's relationship with their father and the extended family. Instead of assuming visitation could not be reasonably accommodated if permission for removal were granted, the presumption ought to be in her favor, *i.e.*, Lisa will continue to cooperate in a reasonable and realistic schedule designed to preserve Timothy's relationship with his children. It is significant Lisa has relatives in Quincy and would occasionally return to Illinois, so Timothy and the extended family would be able to see the children. Further, the paternal grandparents spend part of the winter in Florida and could visit the children then as well. Close relationships can continue and even be enhanced when effort is expended to establish a reasonable visitation schedule. See *In re Marriage of Taylor* (1993), 251 Ill. App. 3d 58, 61-62, 621 N.E.2d 273, 275-76, and *In re Marriage of Zamarripa-Gesundheit* (1988), 175 Ill. App. 3d 184, 189-90, 529 N.E.2d 780, 783.

This decision is not meant as a criticism of Timothy. His motive for resisting visitation is appropriate and sincere. Nor do we fault the trial judge, who conscientiously listened to the evidence and made his decision. We believe, however, a fuller consideration of the benefits children derive from the financial and emotional well-being of a custodial parent is required. Further, since a court has no power to require the noncustodial parent to remain in Illinois, or to require members of the extended family to remain in Illinois, some deference is due to the custodial parent who has already determined the best

interests of her children *and* herself are served by remarriage and removal. The best interests of children cannot be fully understood without also considering the best interests of the custodial parent.

When a move would improve the quality of the custodial parent's life, we conclude the trial judge must consider the benefits to be realized by the child or children from such enhancement of the custodial parent's circumstances. If the trial court finds no benefits will be realized by the children from such an improvement to the custodial parent, the reasons for so finding should be stated. The nature and extent of these benefits will vary depending on the facts of a particular case, but must be considered. By this we do not overrule *Davis*. A desire to move, by itself, with no showing of any actual benefit to be gained from the move, would not require the trial court to give much, if any, thought to the negligible benefits which might flow to the child or children in such a move.

Removal petition cases do not yield any easily applied bright-line rules. The best interests of children cannot be determined on the basis of any bright-line rule, but largely depend upon the circumstances present in each case. (*Eckert*, 119 Ill. 2d at 326, 518 N.E.2d at 1045.) The benefit to a custodial parent, and the benefits to children, will fall along a continuum. The outcome in each case will depend on the trial court's balancing of this and all other relevant factors in each case. We stress no one factor is controlling, and the weight to be accorded each factor will vary according to the facts in each case. Our purpose here is simply to stress the factors listed in *Eckert* are not exclusive and are only factors to be considered and balanced. *Eckert* did not establish a group of tests which a custodial parent must satisfy in order to remove a child or children from Illinois.

The trial court found the proposed move to Florida would substantially impair respondent's involvement with the children, and petitioner's proposed visitation schedule would not preserve and foster the children's relationship with respondent. In his oral comments in announcing the denial of the petition for removal, the judge stated he did not believe, under the circumstances of the case, visitation could be reasonably accommodated if permission for removal were granted. The supreme court described a reasonable visitation schedule as "one that will preserve and foster the child's relationship with the noncustodial parent." *Eckert*, 119 Ill. 2d at 327, 518 N.E.2d at 1046.

Our society places great weight on the right to marry and remarry. While the trial court's decision did not prohibit petitioner from remarrying, it did make that choice much less attractive, forcing her to choose between a new husband in Florida and her children

in Illinois. We have previously stated our disapproval of any implication a noncustodial parent is free to marry whomever he or she wants to, but a custodial parent is not. (*In re Marriage of Deckard* (1993), 246 Ill. App. 3d 427, 434, 615 N.E.2d 1327, 1333.) The interests of the custodial parent should not be subordinated to the interests of the noncustodial parent in this regard. (*Branham*, 248 Ill. App. 3d at 905, 617 N.E.2d at 1322.) Any time the interests and desires of two parties must be accommodated some of this freedom will be a casualty; however, such freedom should not be unnecessarily restricted.

The decision of the trial court was against the manifest weight of the evidence. The petition for removal should have been allowed. Accordingly, judgment of the circuit court of Adams County is reversed, and the cause is remanded for the limited purpose of setting a visitation schedule.

Reversed, and cause remanded with directions.

LUND and GREEN, JJ., concur.